# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-24-00523-CV

### R. F., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 424TH DISTRICT COURT OF BURNET COUNTY
### NO. 54534, THE HONORABLE CHERYLL MABRAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant R.F. (Mother) appeals from the district court's order, following a bench trial, terminating her parental rights to her daughter K.R. (Kylie), who was approximately seven years old at the time of trial, and her son T.G. (Tommy), who was approximately three years old at the time of trial.[1]  In a single issue on appeal, Mother asserts that the evidence is legally and factually insufficient to support the district court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.  We will affirm the district court's order.

---

[1]  For the children's privacy, we refer to them using pseudonyms and to their parents and other relatives by their familial relationships to each other.  *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

The case began in October 2022, when the Texas Department of Family and Protective Services (the Department) received a report alleging neglectful supervision of the children. Department investigator Jenna Wodopian testified that when she first met the children at their residence in Florence, Texas, the children "were not clean. They had dirt on them, gum in their hair, leaves in their hair." Tommy "wasn't wearing any shoes and . . . had, like, layers of dirt on the bottom of his feet." Their parents were not present with the children. Instead, the children were being watched by a neighbor. Following its investigation, the Department sought emergency removal of the children and filed its petition seeking termination of Mother's parental rights to the children.

Three Department caseworkers testified at trial: Candace Hollingsworth, the caseworker from December 2022 until February 2023; Tobi King, the caseworker from February 2023 until July 2023; and Theresa McDonald, the caseworker from July 2023 through trial. Hollingsworth testified that the Department's "overall concerns" with Mother were drug use, alcohol use, and domestic violence. The Department also had concerns that Mother, "when she was intoxicated, would make verbal threats to those around her." To address these concerns, the Department prepared a service plan for Mother. Hollingsworth testified that Mother was involved in creating the services "to an extent." According to Hollingsworth, Mother "felt like the Department shouldn't have any concerns." Mother "welcomed any services that we suggested and that we wanted to implement, but she didn't take a proactive role in requesting

---

[2] The following factual summary is based on evidence presented during the four-day bench trial, held on April 29, May 23, May 31, and June 21, 2024. Because the parties are familiar with the facts of the case, we summarize only the evidence that is relevant to this appeal. *See* Tex. R. App. P. 47.1.

specific services or acknowledging that she needed any assistance." Hollingsworth testified that the service plan required Mother to drug test, submit to a substance abuse assessment, specifically an Outreach, Screening, Assessment, and Referral (OSAR), attend sobriety support groups, complete parenting classes, undergo a psychological evaluation, attend individual therapy, and maintain a safe and drug-free environment for her children. Current caseworker McDonald similarly testified about the plan's requirements:

> First thing we asked is that she have a safe, drug-free home for the children. We wanted her to complete—attend and successfully complete [a] protective parenting class. We needed her to keep the caseworker informed regarding her recovery support system she had, such as AA or whatever else she was using. Complete a psychological evaluation and attend and successfully complete individual therapy. We needed her to complete an OSAR assessment and follow all the recommendations from the OSAR and to do random drug testing as requested by the Department. And she was set up on a weekly color scheme.[3]

The caseworkers each testified regarding their knowledge of Mother's compliance with her service plan. Hollingsworth testified that she communicated with Mother "primarily via text message," copying Mother's attorney on all text messages, and sent Mother "specific service information and important documents via e-mail as well." Hollingsworth recounted that Mother "drug tested a couple of times while [she] was the caseworker," "scheduled an appointment for a

---

[3] These requirements, including the color scheme that was used to facilitate Mother's drug testing, were specified in greater detail in the written service plan, a copy of which was not admitted into evidence during trial but is included in the clerk's record and was made an order of the court. A trial court may "properly take judicial notice that it signed an order adopting the family service plan and what the plan listed as the necessary requirements [a parent] was required to complete before [her children] would be returned to [her]," *In re J.E.H.*, 384 S.W.3d 864, 870 (Tex. App.—San Antonio 2012, no pet.), and we presume that the district court took judicial notice of those requirements here, *see id*. at 869-70 ("[W]hen the record is silent, as here, the trial court may be presumed to have taken judicial notice of the records in the court's file without any request being made and without an announcement in the record that it has done so."). We will discuss the written requirements below as they are relevant to our analysis.

3

psychological evaluation," "reported to [her] that she began parenting classes," and "reported to [her] that she had completed an OSAR." Hollingsworth also "got a verification that [Mother] completed the psychological evaluation." Hollingsworth acknowledged that "it is fair to say that [Mother] gave [her] the impression that she was attempting to engage in her services."

King testified that when she was the caseworker, Mother did not stay in contact with her regularly or on a consistent basis and that it was "a struggle" to obtain correct and current contact information for her. King also testified that Mother did not drug test regularly and that she did not "know of a time where she had three clean, consistent UAs." King recounted that she "set [Mother] up for a lot of services and a lot of services were not attempted or completed," other than the psychological evaluation. King acknowledged, however, that after she left the case in July 2023, Mother had completed additional services and that "[t]here [was] a difference" between Mother's completion of services while King was the caseworker and Mother's completion of services at the time of trial.

McDonald, who took over the case in July 2023, testified that Mother completed an OSAR in September 2023. McDonald explained that the OSAR recommended that Mother receive intensive outpatient treatment, which Mother began in January 2024. McDonald recounted that Mother provided her with a copy of a certificate of completion from that program but that the Department did not accept the certificate because McDonald "did not feel that it demonstrated any changes that [Mother] has implemented in her life regarding substance abuse." McDonald's opinion was based on communication that she had with Shelly Barnes, a licensed chemical dependency counselor at the program, who told McDonald in a phone call that Mother was "not approachable" and "not receptive" to discussions regarding sobriety and that Mother's behavior while in the program was "disruptive to the group and rude." Barnes "finally decided

just to complete [Mother]," explaining that even though Mother was not "totally successful," she "attended about 2/3 of the groups and that was enough to show her completing the program."

Barnes, who testified at trial, explained that her program met online on Tuesday and Thursday evenings and that Mother had "a lot of no-shows," although she "participated when she was there." However, Mother often "would show up, she would go on, off, on, off, on, off, where every time I have to let her back in or the other counselor has to let her back in," which was disruptive to the other participants. Barnes attempted to discharge Mother due to these disruptions but was unable to contact her, so she instead provided her with a certificate of completion, even though Mother "did not engage well in treatment." Barnes believed that Mother had completed the program because she had attended "two-thirds of the group" meetings, although she did not believe that Mother learned anything in the program because "she was not engaged." In addition to the certificate of completion, Mother also received a relapse prevention plan and a discharge plan from the program.

McDonald testified that Mother did not complete the protective-parenting and individual-therapy requirements. Mother was on her fourth therapist. McDonald explained that Mother was discharged from her first three therapists "for nonattendance, noncompliance." Mother had told McDonald that "she didn't feel like she needed therapy, she had had therapy when she was younger and it didn't do any good, so she didn't need to do therapy now."

Mother's fourth and current therapist was Sam Calloway, who testified that he had been meeting online or on the phone with Mother beginning in February 2024, "mostly" on a regular basis, although the meetings had been "a little sporadic." Calloway estimated that Mother had attended twelve to fourteen sessions, focusing on a variety of topics including "drug involvement and/or alcohol," "being consistent with life," and "trying to become more stable."

5

Calloway added that they had also discussed protective parenting in "about half" of their sessions, completing four of Calloway's thirteen sessions on the subject.

Mother had attended a separate online protective-parenting group with Dr. Tina Nunnellee, a licensed professional counselor, beginning in November 2023. Dr. Nunnellee testified that her course was twelve weeks long and that to complete the course, parents had to attend all twelve sessions and would have to start over if they missed two consecutive sessions, which is what happened to Mother and Father in this case. Dr. Nunnellee explained:

> It is 12 weeks. If they miss two weeks in a row, they have to restart unless there are, like, extenuating circumstances. Sometimes people have to go and, for example, sit some time out and we can make other arrangements for that. Otherwise they just have to keep starting over. And that's what happened here. They have the opportunity to just keep coming until they've done the 12 as long as they don't miss two in a row, then we have to make other arrangements.
>
> And that's what has happened here is they kept missing two or more consecutive groups, so they had to keep starting over and over again.

Nunnellee testified that Mother had to start over three times, and she attended only six of the twelve sessions. Nunnellee acknowledged, however, that Mother was able to explain what she had learned at the end of every session she attended.

McDonald testified extensively regarding Mother's drug testing. McDonald explained that the Department uses a "color scheme" for testing and that Mother was "assigned the color blue." Mother was "to call a number . . . daily during the week, Monday through Friday after 8:00 a.m., and the recording will state what the color of the day is. She is to leave her name at the tone to indicate she had called and then she is to go to her testing place by 3:00

p.m. that day."[4]  McDonald explained that throughout the case, Mother did not test consistently, although "[w]hen she did test, most of the time it was on her color day.  There were other times that she did not test on her color day and then would test on another day shortly after."  McDonald added that there were also times when she asked Mother to test on non-color days and that Mother did not do so.  McDonald recalled one occasion following an April 2024 court hearing when the court ordered Mother to test and she failed to test, despite being given three different opportunities to do so, and another occasion in May 2024 when Mother failed to test on her color day but tested the following day.  McDonald testified that over the course of the case, Mother had 76 negative drug or alcohol tests but missed 16 tests, which the Department counted

---

[4]  The written service plan described the testing requirement as follows:

[Mother] will submit to drug and alcohol testing as required by the Department.  This could include hair strands, nail tests, and urine analysis.

The Department is setting up [Mother] to drug test randomly on the color system.  Here are the instructions on how the color system works:

[Mother] is being assigned the color BLUE.

Every day (Monday-Friday) [Mother] will call the drug testing phone line at 512-556-4345.  [Mother] will need to call before 9am.

[Mother] will leave her full name on the recording so that the Department can verify that she is calling in.

If BLUE is the color for that day, [Mother] will need to provide a UA and/or other specified drug test before 3pm on that same day.

7

as positive tests. Additionally, a UA test from November 2023 was determined to be inconclusive due to a low level of urine in the specimen; a UA test from later in November 2023 was found to be a "substituted sample" that did not contain human urine; and a hair-strand test from March 27, 2024, approximately one month before trial began, was positive for methamphetamine. McDonald further testified that Mother wore a wig during the April 29, 2024 trial setting at which Mother was ordered to submit to a segmented-hair-strand test and that on the May 23, 2024 trial setting, she observed that Mother was growing her hair "[v]ery, very short," "like she was growing out almost a buzz cut."

On May 31, 2024, at the end of the third day of trial, the district court ordered Mother "to submit to a UA, hair, and nail test at 9:00 A.M. on Monday, 6/3/24, and continue to UA weekly on the color scheme." When trial resumed on June 21, 2024, McDonald testified that Mother "did the UA" but "did not have enough fingernails or toenails to do a nail test and she refused to do the hair test." McDonald also testified that for the week of June 11, Mother "did not go to test on her scheduled day" but "went in the next day." On that day, Mother "did a UA for drugs" but did not provide a second urine specimen to test for alcohol. Mother was also scheduled to test the day before trial resumed but "did not go in" to test that day.

At the conclusion of trial, the district court took the matter under advisement and later rendered judgment terminating Mother's and Father's parental rights to the children. Regarding the termination of Mother's parental rights, the district court found by clear and convincing evidence that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children and that termination of Mother's parental rights was in the best interest of the children. *See* Tex. Fam. Code § 161.001(b)(1)(O), (2). This appeal by Mother followed.

8

## STANDARD OF REVIEW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam.

9

Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

10

**DISCUSSION**

In her sole issue on appeal, Mother asserts that the evidence is legally and factually insufficient to support termination of her parental rights under paragraph (O) of Family Code Section 161.001(b)(1), which permits termination if a parent "failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child." Tex. Fam. Code § 161.001(b)(1)(O). Mother acknowledges that she did not fully comply with her court-ordered service plan, but she argues that the Department failed to prove that she was noncompliant "to the degree that would justify the termination of her parental rights."

**Applicable law**

"[N]early all [statutory grounds for termination] require proof that the parent has abandoned or endangered the child or that the parent has engaged in specified criminal conduct." *In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023). "The exception is (O)," which "permits termination if a parent fails to comply with a family service plan, which, in lay terms, is a list of tasks the Department requires—and the trial court orders—the parent to perform to obtain the return of a child following removal." *Id.*

There are limitations on the extent to which a trial court may rely on (O) to support the termination of parental rights. "To begin, the statutory text permits termination only if the provision with which the parent failed to comply was 'specifically established' in the written court-ordered service plan." *Id.* "The predicate ground for termination under (O) cannot be proven by clear and convincing evidence if premised on a plan requirement that is unwritten, and thus supplied only by the caseworker's oral testimony, or on one that is written but vague."

11

*Id.* "[A]s its text expressly indicates, '[s]ubsection (O) contemplates direct, specifically required actions.'" *Id.* at 378 (quoting *In re A.L.R.*, 646 S.W.3d 833, 837 (Tex. 2022)). A parent's rights may not be terminated based on "vague plan requirements." *Id.* Rather, "the court's order describing the parent's necessary actions 'must be sufficiently specific to warrant termination of parental rights for failure to comply with it.'" *Id.* (quoting *In re N.G.*, 577 S.W.3d 230, 238 (Tex. 2019)).

"Moreover, even if the Department proves by clear and convincing evidence that a parent failed to comply with a requirement 'specifically established' in the written plan, that requirement may be so trivial and immaterial, considering the totality of what the plan requires, that the parent's noncompliance does not justify termination." *Id.* at 373. "[T]ermination is not automatic or required" under (O), *id.* at 379, and "[a] trial court should not reflexively order termination when the evidence demonstrates noncompliance with a plan requirement," *id.* at 373. "Instead, the trial court should consider whether the nature and degree of the asserted noncompliance justifies termination under the totality of the circumstances." *Id.* at 373-74. "[I]t is the violation of 'material' requirements of a plan that justify termination under (O)." *Id.* at 379. "Thus, if the noncompliance is trivial or immaterial in light of the plan's requirements overall, termination under (O) is not appropriate." *Id.*

On the other hand, "parents cannot overcome the complete failure to comply with a material requirement by arguing that performing other requirements constitutes substantial compliance with the plan overall." *Id.* at 382. "There may be provisions in particular service plans for which nothing less than strict compliance will suffice to avoid termination." *Id.* "Easy examples are provisions that require a parent suffering from drug addiction to complete a drug treatment program or require a parent just released from prison to refrain from re-offending." *Id.*

12

"Even a single or slight violation of these or other material service plan provisions *could* justify termination." *Id.* "But other requirements—particularly those that are bureaucratic or technical—may be too trivial, in the larger context of the plan and the parent's overall performance, to have their breach give rise to termination." *Id.* For example, *in R.J.G.*, the court held that when "the plan requires a parent to attend classes with a specified service provider and the parent goes elsewhere (with the Department's approval), the parent's technical noncompliance with that requirement would not support termination under (O)." *Id.* Similarly, when the plan requires the completion of parenting classes, "the caseworker's bare assertion that she 'does not have' a piece of paper proving completion of classes, even if technically required by the plan, cannot support termination when there is other evidence that the classes were completed." *Id.*

"In sum, not all service plan requirements are created equal, and strict compliance with every aspect of every plan requirement is not always the standard." *Id.* "In evaluating whether termination is warranted, the trial court must ensure that any asserted noncompliance is of a requirement that is neither unwritten nor vague but rather 'specifically established' in a court-ordered plan." *Id.* at 383. "Additionally, to justify termination, the noncompliance must not be trivial or immaterial in light of the nature and degree of the parent's compliance and the totality of the plan's requirements." *Id.*

**Analysis**

In this case, Mother complied with some service-plan requirements, including completing her psychological evaluation, completing an OSAR, and following the OSAR's recommendation to receive intensive outpatient treatment. Mother obtained a certificate of

completion from that program, and we agree with Mother that this is sufficient to show that she complied with that service-plan requirement.

Additionally, regarding the individual-therapy requirement, Mother was required to "attend and actively participate in individual therapy . . . until successfully discharged by her therapist." Although she had been unsuccessfully discharged from her first three therapists "for nonattendance, noncompliance" reasons during the first year of the case, she began seeing her fourth therapist, Calloway, in February 2024, and these therapy sessions seemed to be going well. Mother and Calloway had been meeting on a "mostly" regular basis since that time, although the meetings had been "a little sporadic." Calloway estimated that Mother had attended twelve to fourteen sessions with him, focusing on topics including "drug involvement and/or alcohol," "being consistent with life," "trying to become more stable," and protective parenting, which was a separate plan requirement. Thus, Mother did "attend and actively participate in individual therapy," and we cannot say that her failure to complete it by the time of trial rises to the level of a "material violation" of the service plan.

However, Mother was required "to attend and successfully complete protective-parenting classes." She did not complete protective-parenting classes, either with Calloway or Nunnellee. Although Nunnellee acknowledged that Mother was able to explain what she had learned at the end of every session she attended, Nunnellee testified that Mother had to start over three times after missing two consecutive sessions each time and that as a result, Mother had attended only six of twelve sessions. Similarly, Calloway testified that Mother completed only four of Calloway's thirteen sessions on the subject. This was a material violation of the plan. *See In re B.M.P.J.*, No. 13-24-00134-CV, 2024 WL 3306741, at *8 (Tex. App.—Corpus Christi-Edinburg July 5, 2024, no pet.) (mem. op.) (concluding that, among other services, parenting

14

classes were "a material requirement that Mother needed to complete to demonstrate that she could provide [her child] with a safe and stable home environment"); *but see In re. R.J.G.*, 681 S.W.3d at 382 (parent testified that she completed required parenting classes but with different service provider and caseworker testified that she did not have written "certificate of completion"; court explained that "while the *completion* of required parenting classes may well be necessary to obtain a child's return," failure to provide "piece of paper proving completion of classes, even if technically required by the plan, cannot support termination when there is other evidence that the classes were *completed*" (emphases added)).

Regarding the service-plan requirements relating to Mother's drug use, Mother acknowledges in her brief that they "seem to serve as the crux of the case." One of the express goals of the service plan was for Mother and Father to "demonstrate they can maintain a sober lifestyle for the duration of the case, so that appropriate supervision can be provided to [the children] that will ensure their safety and well-being after the case is dismissed." To that end, Mother was required to "not use illegal substances during the life of the case" and to drug test regularly using the Department's color-scheme system summarized above. It is true, as Mother observes, that she tested negative 76 times. However, she also missed sixteen tests, which the Department considers to be positive tests, submitted two urine samples that were found to contain low levels of human urine and thus could not produce conclusive results, and tested positive for methamphetamine on a hair-strand test approximately one month before trial began. The district court could have reasonably found that Mother's failure to drug test on numerous occasions and to test positive for methamphetamine near the end of the case were material violations of the service plan. *See In re J.A.G.*, No. 04-24-00511-CV, 2025 WL 99616, at *9-10 (Tex. App.—San Antonio Jan. 15, 2025, no pet. h.) (mem. op.) (concluding that violation of

15

subsection (O) was supported by legally and factually sufficient evidence when, despite parent's compliance with other aspects of her service plan, evidence showed "a wide departure from the service plan's drug-testing and -abstinence requirements, which were material to the plan"); *In re Z.R.E.B.*, No. 11-23-00233-CV, 2024 WL 968965, at *4 (Tex. App.—Eastland Mar. 7, 2024, no pet.) (mem. op.) ("Drug and alcohol restrictions are material service plan requirements[.]"); *In re A.P.*, No. 13-19-00342-CV, 2019 WL 6315429, at *7 (Tex. App.—Corpus Christi-Edinburg Nov. 26, 2019, no pet.) (mem. op.) (concluding that parent "failed to comply with numerous, material provisions of the service plan," including failing to submit to drug tests for several months, testing positive for drugs on three occasions, and using drugs two weeks before trial).

Viewing the totality of the above evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. Accordingly, the evidence is legally sufficient to support the finding. Moreover, when we consider the evidence contrary to the district court's finding, specifically the evidence of Mother's compliance with some of the service-plan requirements discussed above, we are unable to say that this evidence is "so significant that the factfinder could not have formed a firm belief or conviction" that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. Accordingly, the evidence is factually sufficient to support the finding.

We overrule Mother's sole issue on appeal.

16

**CONCLUSION**

We affirm the district court's order terminating Mother's parental rights.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed

Filed:   January 31, 2025